1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10

11  MARLON ABRAHAM              )   Case No. 2:21-cv-6811-SPG (SP)
    ROSASEN, et al.,           )
12                             )
             Plaintiffs,        )   **REPORT AND**
13                             )   **RECOMMENDATION OF UNITED**
        vs.                    )   **STATES MAGISTRATE JUDGE**
14                             )
    KINGDOM OF NORWAY, et al., )
15                             )
             Defendants.        )
16                             )
17  ─────────────────────────── )

18      This Report and Recommendation is submitted to the Honorable Sherilyn

19  Peace Garnett, United States District Judge, pursuant to the provisions of 28 U.S.C.

20  § 636 and General Order 05-07 of the United States District Court for the Central

21  District of California.

22                              **I.**

23                        **INTRODUCTION**

24      On August 24, 2021, pro se plaintiff Marlon Abraham Rosasen filed a

25  Complaint on his and his two children's (D.T.R. and L.A.R.) behalf alleging that

26  the Kingdom of Norway and multiple of its departments and officers conspired to

27
28

                              1

1    abduct the children and remove them to Norway.[1]  Plaintiff filed a First Amended
2    Complaint ("FAC") on April 18, 2022.  Docket no. 40.[2]  Plaintiff filed a Second
3    Amended Complaint ("SAC") on June 23, 2022 (docket no. 42); however, he did
4    not have leave of court to do so.

5        Along with the original complaint, plaintiff filed a motion for appointment
6    as guardian ad litem ("GAL") for D.T.R. and L.A.R.  Docket no. 2.  The court
7    denied the motion on September 21, 2021, reasoning that plaintiff would have a
8    potential conflict of interest in acting as his children's GAL since he is also a
9    plaintiff in this case.  Docket no. 14.  Indeed, the court found the potential for
10   conflict in this action is greater because it involves a custody dispute, and it is
11   unclear whether plaintiff's interests are truly aligned with those of the minor
12   plaintiffs.  *Id.* at 1.  Accordingly, the court ordered plaintiff to propose a different,
13   non-conflicted GAL no later than October 22, 2021.  *Id.*

14   On October 22, 2021, plaintiff filed a request for reconsideration of his GAL
15   application.  Docket no. 18.  The court denied the request on December 2, 2021.
16   Docket no. 20.  In addition to reiterating that plaintiff had a potential conflict of
17   interest with his children, the court noted that the GAL would need to obtain
18   counsel in order to pursue the children's claims.  *Id.* at 1-2.  The court thus ordered
19   plaintiff to, no later than December 23, 2021, retain counsel for the minor plaintiffs
20   and have that counsel file a new GAL application.  *Id.* at 2.

21   On December 20, 2021, plaintiff filed three motions: A motion for default
22   judgment against defendant Kingdom of Norway (docket no. 25); a motion for
23   appointment of counsel (docket no. 26); and a motion for the court to solicit the

24   _____

25        [1]    Throughout this report, the court uses the term "plaintiff" to refer to
26   plaintiff Marlon A. Rosasen.

27        [2]    Plaintiff filed duplicate copies of the FAC.  *See* docket nos. 39-40.
28   The court here references the version entered as number 40 on the docket.

position of the U.S. Department of State (docket no. 27).  The court denied all motions on February 10, 2022 (docket no. 32), and issued two orders to show cause ("OSCs").  The first OSC required plaintiff to explain why the minor plaintiffs' claims should not be dismissed for failure to comply with the court's prior orders.  OSC Re: Minors, docket no. 33.  The second OSC required plaintiff to (1) clearly and unequivocally identify each of the defendants he seeks to name in this action; (2) show cause why the court should not find that the purported entity defendants are immune from suit under the Foreign Sovereign Immunities Act ("FSIA"); (3) show cause why the court should not construe the claims against the purported individual defendants as claims against Norway itself; and (4) show cause why the court should not find that the individual defendants would, in any event, be protected by common law foreign sovereign immunity.  OSC Re: Jurisdiction, docket no. 34.  As part of its denial of plaintiff's motion for default judgment, the court also ordered him to initiate service of process under the Hague Convention no later than March 28, 2022.  Docket no. 32.

On February 25, 2022, plaintiff filed a response to the court's OSCs.  P. Resp. to OSCs, docket no. 35.  He then filed a request for corrections to his response on March 1, 2022.  P. Corrections to Resp., docket no. 37.  On March 28, 2022, he requested the Clerk of the Court's assistance with effecting service of process.  Docket no. 38.  As previously noted, he filed a FAC on April 18, 2022.

Liberally construing the FAC's allegations, the court finds the minor plaintiffs' claims should be dismissed for lack of legal representation and an adequate GAL; the Norwegian state is the real party in interest and so the individual defendants should be dismissed; and the court lacks jurisdiction under the FSIA to entertain the remaining claims against Norway and its departments.  As such, it is recommended that the FAC be dismissed without leave to amend.

1

## II.

2

## <u>ALLEGATIONS OF THE FIRST AMENDED COMPLAINT</u>[3]

3      The following background is taken from plaintiff's allegations in the FAC,

4   which are unclear at times.  Plaintiff's twin children, D.T.R. and L.A.R., were born

5   abroad in 2015, and at some point after their birth, the family lived in Norway.  *See*

6   FAC ¶¶ 64, 67-69.  In June of 2019, plaintiff found out that his former

7   psychologist sent a "concern" to Norway's Child Protective Services ("NCPS").

8   *Id.* ¶ 67.  A week later, plaintiff returned to the U.S. after being banned from

9   Norway due to, among other things, his criminal record.  *See id.* ¶¶ 58, 68.  On that

10   same day, NCPS began an investigation into the children's custody and welfare.

11   *See id.* ¶ 68.

12      In July of 2019, the family (i.e., plaintiff, his then-wife, and the two

13   children) met in Denmark with the intention of returning to the U.S.  *See id.* ¶¶ 70-

14   71.  The mother, however, returned to Norway, leaving the children with plaintiff.

15   *See id.* ¶¶ 73-76.  Defendants enlisted the police to convince the mother to bring

16   the children back to Norway in exchange for a favorable outcome to the NCPS

17   investigation against her.  *See id.* ¶¶ 75-77.  Instead of cooperating, the mother

18   alerted plaintiff, who took the children to the U.S.  *See id.* ¶ 77.  When NCPS

19   learned that the children were taken to the U.S., it contacted one of the other

20   defendants to falsely accuse plaintiff of being a violent offender.  *See id.* ¶ 78.

21

22      [3]      As noted above, plaintiff filed a Second Amended Complaint on June

23   23, 2022, but did so without leave of court, and therefore the SAC should be

24   stricken.  *See* Fed. R. Civ. P. 15(a)(2).  Nonetheless, the court notes that the

     allegations in the SAC are substantially the same as those in the FAC, particularly

25   for purposes of the recommended ruling here.  The SAC names all the defendants

26   named in the FAC plus four additional Norwegian government officials or

     employees.  The allegations in the FAC and SAC are also substantially the same,

27   with the SAC adding certain allegations regarding plaintiff's communications with

28   government officials after the filing of the FAC.

When the mother failed to join the rest of the family in the U.S. as planned, plaintiff contacted the U.S. Department of State and other individuals for assistance. *See id.* ¶¶ 82-83.  In response to his attempts at reunification, the mother explained that NCPS prevented her from traveling to the U.S. due to the investigation into her parental abilities. *See id.* ¶ 83.  Shortly after, plaintiff filed for separation and joint custody in Los Angeles Superior Court on September 23, 2019. *See id.* ¶ 84.

In or around October and November of 2019, defendants hired a U.S. law firm to seek the children's return to Norway under the Hague Convention. *See id.* ¶¶ 86-88.  The following month, plaintiff filed an emergency motion to prevent the children's removal from Los Angeles County. *See id.* ¶ 89.  Instead of appearing at the hearing on that motion, defendants filed their own sealed motion in federal court.[4] *See id.* ¶¶ 90-91.  After the federal case was filed, the mother arrived in the U.S., at which time she was served with a temporary custody order and travel ban. *See id.* ¶ 93.

Plaintiff accuses defendants of attempting to bypass U.S. law in their efforts to return the children to Norway. *See id.* ¶ 94.  On January 6, 2020, after plaintiff met with his ex-wife, defendants filed a request for an arrest warrant in state court, which was granted two days later. *See id.* ¶ 96.  It is unclear from the FAC what happened with that warrant.

On January 10, 2020, the family court stayed plaintiff's case pending the outcome of the federal Hague Convention case filed by defendants. *See id.* ¶ 99.

---

[4]      Plaintiff seems to be referring to *Thea Marie Rosasen v. Marlon Abraham Rosasen*, No. 2:19-cv-10742-JFW (AFMx) (C.D. Cal.) ("*Rosasen I*"), and related case *In re the Application of Thea Marie Rosasen*, No. 2:20-cv-1140-JFW (AFMx) (C.D. Cal.) ("*Rosasen II*").  The court takes judicial notice of the dockets in those cases. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (courts may take judicial notice of court filings in other cases).

Plaintiff claims that defendants abused the federal judicial process in various ways. *See id.* ¶¶ 104-14. Ultimately, as a result of one of defendants' misrepresentations, the federal court ordered the U.S. Marshals to seize the children. *See id.* ¶ 113. On April 3, 2020, law enforcement found plaintiff in Iowa, detained him, and took the children. *See id.* ¶ 114. The children were returned to Norway shortly after. *See id.* ¶ 115. Once there, NCPS took legal custody of the children but allowed the mother to retain physical custody as long as she agreed to raise them in Norway without contact with plaintiff. *See id.* ¶ 119.

Plaintiff sought relief from the Ninth Circuit, which has not yet ruled on his appeal. *See id.* ¶ 122. On December 7, 2020, defendants offered to allow the children to visit the father in the U.S., but only if he withdrew his appeal. *See id.* ¶ 129. It appears that plaintiff refused to do so.

Plaintiff also filed a request for the children's return in a Norwegian court pursuant to the Hague Convention. *See id.* ¶ 127. He claims, however, that the Oslo court overseeing the case did not give him a proper opportunity to be heard. *See id.* ¶ 130. On December 23, 2020, the court ruled against him. *See id.* ¶ 131. He alleges the decision violated international law and treaties. *See id.* The decision was affirmed by both an intermediate appeals court and the Supreme Court of Norway. *See id.* ¶¶ 133, 137. Plaintiff claims he has not heard from his children since November 2020. *See id.* ¶ 136.

Although not entirely clear, it appears that plaintiff claims the following violations of law: (1) deprivation of rights under color of law pursuant to 18 U.S.C. § 242; (2) interference with personal relationship and rights to consortium; (3) conspiracy; (4) violations of the Hague Convention; (5) violations of the United Nations Convention on the Rights of the Child; (6) violations of the United Nations Universal Declaration of Human Rights; (7) deprivation of equal protection; (8) interference with Fourteenth Amendment right to familial association; (8) interference with First Amendment right to familial association; (9) unlawful

6

seizure; (10) kidnapping pursuant to California Penal Code § 207; (11) abduction pursuant to California Penal Code § 278; (12) violations of California Family Law Code § 3405; (13) international child abduction; and (14) racketeering pursuant to 18 U.S.C. § 1961.  *See* FAC ¶¶ 172-217.  Plaintiff seeks monetary damages and restoration of the children's rights to travel to the U.S.  *See id.*, Prayer for Relief.

### III.
### <u>STANDARD OF REVIEW</u>

Where a plaintiff appears pro se in a civil rights case, the court must construe the pleadings liberally and afford the plaintiff any benefit of the doubt. *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988) (citation omitted).  But a trial court may dismiss a claim sua sponte and without notice if the claimant cannot possibly win relief.  *See Omar v. Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987) (citation omitted).  The complaint must both "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . [and] must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  Federal courts must examine jurisdictional issues sua sponte.  *Bernhardt v. Cnty. of L.A.*, 279 F.3d 862, 868 (9th Cir. 2002) (citations omitted); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

### IV.
### <u>DISCUSSION</u>

The court has considered plaintiff's response to its OSCs and the allegations made in the FAC.  For the following reasons, the court recommends dismissing the entire case with prejudice.

### A.    <u>The Minor Plaintiffs' Claims Should Be Dismissed</u>

Courts recognize that a potential conflict of interest arises when a parent and

his or her minor children are litigants in the same case.  *See Garrick v. Weaver*, 888 F.2d 687, 693 (10th Cir. 1989) (conflict of interest where parent and minor children were claimants to the same settlement fund).  "[I]f the parent has an actual or potential conflict of interest with his child, the parent has no right to control or influence the child's litigation."  *Williams v. Super. Ct.*, 147 Cal. App. 4th 36, 50 (2007).

By statute, litigants have the right to represent themselves in federal court, that is, to "plead and conduct their own cases personally."  28 U.S.C. § 1654.  But "[i]t is well established that the privilege to represent oneself *pro se* provided by § 1654 is personal to the litigant and does not extend to other parties or entities."  *Simon v. Hartford Life, Inc.,* 546 F.3d 661, 664 (9th Cir. 2008) (citation omitted).  In other words, pro se litigants have no authority to represent anyone other than themselves.  *See Johns v. Cnty. of San Diego*, 114 F.3d 874, 877 (9th Cir. 1997) (parent cannot bring action on behalf of minor without retaining counsel); *Cato v. U.S.*, 70 F.3d 1103, 1105 n.1 (9th Cir. 1995) (non-attorney may only appear in her own behalf).  The Ninth Circuit has squarely held that "a parent or guardian cannot bring an action on behalf of a minor child without retaining a lawyer."  *Johns*, 114 F.3d at 877; *accord Jie Lin v. Ashcroft*, 377 F.3d 1014, 1025 (9th Cir. 2004).

Here, as recounted above, the court has given plaintiff multiple opportunities to propose an appropriate guardian ad litem for his children and secure counsel to represent their claims.  Instead of doing so, plaintiff continues to re-litigate the issue.  Namely, in his response to the court's OSCs, plaintiff claims that this litigation is motivated by his "unconditional love and dedication" to protecting the minor plaintiffs.  P. Corrections to Resp. at 3.  He argues that because he was himself deprived of his childhood, he "is well positioned to assure the best interests of plaintiffs during trial and or enforcement of a Default Judgment."  *See id.*  He again asks the court to allow his appointment as GAL or suggest an alternative solution.  *Id.*

8

The court has already explained why it will not appoint plaintiff as GAL or allow the minor plaintiffs' claims to proceed without legal representation. In short, plaintiff has at least a potential conflict of interest with his children and may not in any event assert claims on their behalf without retaining counsel. The court has no reason to doubt that plaintiff loves his children and is pursuing what he believes is the best course of action on their behalf. But that is not the legal standard the court is bound to apply. The court has given plaintiff multiple opportunities to cure these defects, yet plaintiff insists on re-litigating his ability to serve as GAL. Accordingly, the court recommends dismissal of the minor plaintiffs' claims.

**B.      The Individual Defendants Should Be Dismissed**

In its OSC regarding jurisdiction, the court ordered plaintiff to clearly and unequivocally identify each of the defendants he seeks to name in this action, including foreign states, political subdivisions, agencies, instrumentalities, and individuals. OSC Re: Jurisdiction at 11. Plaintiff responded that "[t]he Court rightly construe[d] the Complaint as against Norway itself." P. Resp. to OSCs at 5. But plaintiff also states that "[t]he individual named defendants acted as agents and or employees of the foreign sovereign and upon its instructions." *Id.* Plaintiff goes on to identify as defendants all of the eighteen parties he listed in his original Complaint. *Id.*

Neither Plaintiff's response to the OSC nor the FAC resolve the court's confusion. On one hand, he continues to identify all of the original parties as defendants. On the other, he states that his complaint is rightly construed as against Norway itself.

In light of plaintiff's response, the court construes the FAC as filed against Norway and the six political subdivisions, agencies, or instrumentalities listed in the FAC ("the entity defendants"), including: The County Governor of Oslo and

Viken[5]; Norway's Ministry of Justice and Public Security, Department of Civil Affairs; Norway's Ministry of Children and Families; Norway's Directorate of Children, Youth, and Family Affairs; Oslo Child Protective Services, Measure Section; and Norway's Ministry of Health and Care Services for Oslo University Hospital.

The court recommends dismissal of the individual defendants: Valgerd Svarstad Haugland; Suzanne Rusten; Hanna Kristiane Rummelhoff; Hege Skaanes Nyhus; Linn Krosveen; Mari Trommald; Per Helge Nesse Rise; Maria Knudsen; Silje Erake Gudmestad; Annette Sophie Lorck-Falk; and Thale Bostad.[6]  In the FAC, plaintiff states that these individuals "are employees of the foreign Sovereign and acted within the scope of their employment and upon instruction of the foreign Sovereign['s] instrumentalities and agencies."  FAC ¶ 36.  And as previously noted, he confirms that the complaint is rightly construed as against Norway itself. Indeed, throughout the FAC, he makes clear that his quarrel really is with the Norwegian government.  He alleges that Norway's judicial history shows systematic flaws in its ability to protect family rights and a "rampant chauvinistic belief" that it is better to raise children in Norway than anywhere else.  *See id.* ¶¶ 2, 48, 50.  He also claims that the European Court of Human Rights has found Norway guilty of violating the rights of families on eight occasions since 2018.  *Id.* ¶ 49.  According to plaintiff, the European Union and the United Nations have

---

[5]     In its OSC regarding jurisdiction, the court assumed that plaintiff intended to name the office of the County Governor of Oslo and Viken, rather than the individual who occupies that position.  OSC Re: Jurisdiction at 5 n.2.  The FAC clarifies that plaintiff intended to name both the office and the individual (i.e., Haugland).  *See* FAC ¶ 27.

[6]     Were the SAC to be allowed, the additional individual defendants named therein – Lene Smith Walaas, Asne Karlsen Bellika, Jan Kato Fremstad, and Suzan Serdashti – should likewise be dismissed.

1   demanded judicial and legislative change.  *Id.* ¶ 50.

2       In light of these allegations, the individual defendants should be dismissed

3   from this action.  *See Samantar v. Yousuf*, 560 U.S. 305, 325, 130 S. Ct. 2278, 176

4   L. Ed. 2d 1047 (2010) ("[I]t may be the case that some actions against an official in

5   his official capacity should be treated as actions against the foreign state itself, as

6   the state is the real party in interest." (citation omitted)). *Odhiambo v. Republic of*

7   *Kenya*, 930 F. Supp. 2d 17, 34-35 (D.D.C. 2013) (treating suit against individual

8   officials acting in their official capacity as a suit against the foreign state); *Gomes*

9   *v. Angop*, 2012 WL 3637453, at *18-19 (E.D.N.Y. Aug. 22, 2012) (real party in

10  interest was foreign state where plaintiff made only official-capacity claims).

11  **C.    Plaintiff's Claims Against Norway and Its Departments Should Be**

12          **Dismissed**

13      In light of the court's recommendation to dismiss the individual defendants,

14  the only remaining claims are those raised against Norway and the six political

15  subdivisions, agencies, or instrumentalities identified above.  These claims should

16  be dismissed for lack of jurisdiction.

17      The Foreign Sovereign Immunities Act is the "'sole basis' for obtaining

18  jurisdiction over a foreign state in a civil action."  *Broidy Cap. Mgmt., LLC v. State*

19  *of Qatar*, 982 F.3d 582, 589 (9th Cir. 2020) (quoting *Republic of Argentina v.*

20  *Weltover, Inc.*, 504 U.S. 607, 611, 112 S. Ct. 2160, 119 L. Ed. 2d 394 (1992)).  A

21  "foreign state," except as that term is used in § 1608 of the FSIA, includes its

22  political subdivisions, agencies, and instrumentalities.  28 U.S.C. § 1603(a).  An

23  agency or instrumentality of a foreign state refers to any entity:

24          (1) which is a separate legal person, corporate or otherwise, and

25          (2) which is an organ of a foreign state or political subdivision

26          thereof, or a majority of whose shares or other ownership interest is

27          owned by a foreign state or political subdivision thereof, and

28          (3) which is neither a citizen of a State of the United States as defined

                                        11

1    in section 1332(c) and (e) of this title, nor created under the laws of
2    any third country.

3  28 U.S.C. § 1603(b).  Federal courts have automatic personal jurisdiction over a
4  foreign state if one of the FSIA's enumerated exceptions to sovereign immunity
5  applies (*see* 28 U.S.C. §§ 1604, 1605, 1607) and service of process has been
6  accomplished pursuant to § 1608 of the FSIA.  *See Samantar*, 560 U.S. at 324 n.20
7  (quoting 28 U.S.C. § 1330(b)).

8       Here, the entity defendants appear to be within the definition of foreign
9  states, political subdivisions, agencies, or instrumentalities.  But to exercise
10 jurisdiction over these entities, one of the FSIA's exceptions to sovereign
11 immunity must apply.  Plaintiff argues that the court has jurisdiction over the entity
12 defendants pursuant to two separate FSIA exceptions, the commercial activity and
13 the tortious activity exceptions.  *See* P. Resp. to OSCs at 3.  The court disagrees.

14      1.      **The FSIA's Commercial Activity Exception Is Inapplicable**

15      The FSIA's commercial activity exception provides that foreign states are
16 not immune from this court's jurisdiction in actions:

17      based upon a commercial activity carried on in the United States by
18      the foreign state; or upon an act performed in the United States in
19      connection with a commercial activity of the foreign state elsewhere;
20      or upon an act outside the territory of the United States in connection
21      with a commercial activity of the foreign state elsewhere and that act
22      causes a direct effect in the United States[.]

23 28 U.S.C. § 1605(a)(2).  When analyzing whether this exception applies, courts
24 must first identify the particular conduct on which the action is "based" for
25 purposes of the FSIA.  *Saudi Arabia v. Nelson*, 507 U.S. 349, 356, 113 S. Ct. 1471,
26 123 L. Ed. 2d 47 (1993).  The next question is whether that conduct constitutes
27 "commercial activity."  *Id.* at 358-59.

28

1

### a. Conduct on Which This Action Is Based

2      The Supreme Court has defined the FSIA's "based upon" language to refer

3 to conduct that forms the "basis" or "foundation" for a claim. *Id.* at 357 (citations

4 omitted).  "[T]he phrase is read most naturally to mean those elements of a claim

5 that, if proven, would entitle a plaintiff to relief under his theory of the case." *Id.*

6 (citations omitted).

7      Generally speaking, plaintiff alleges that defendants conspired to abduct his

8 children under color of law and are now denying him parental consortium. *See*

9 FAC ¶¶ 5, 41, 52.  In support of their conspiracy, defendants allegedly used their

10 governmental authority to, among other things, begin an investigation into the

11 children's welfare based on defamatory allegations and send Norwegian police to

12 intimidate plaintiff's ex-wife. *See id.* ¶¶ 68, 75, 78.  Plaintiff claims defendants

13 also hired a U.S. law firm to facilitate the children's abduction by presenting false

14 evidence to American courts and violating procedures. *See id.* ¶¶ 30, 86-88, 92-96,

15 100, 102-107, 109-14, 117.

16      The Supreme Court's findings in *Saudi Arabia v. Nelson* are particularly

17 instructive for identifying the basis of this lawsuit.  In *Nelson*, an American signed

18 a contract to work as a systems engineer at a hospital owned and operated by Saudi

19 Arabia in that country.  507 U.S. at 351.  After several months of working at the

20 hospital, Nelson discovered safety defects in its oxygen and nitrous oxide lines that

21 posed fire hazards and endangered patients' lives. *Id.* at 352.  He repeatedly

22 reported the defects to the hospital and a Saudi government commission. *Id.*  After

23 multiple reports, government agents arrested him and subsequently imprisoned and

24 tortured him for over a month. *See id.* at 352-53.  Upon returning to the U.S., he

25 and his wife sued the Saudi government and its agents, including the hospital, for

26 intentional torts, negligence, and derivative injuries. *See id.* at 353-54.

27      In identifying the particular conduct on which the plaintiffs' action was

28 based, the Supreme Court distinguished between the activities that formed the basis

13

1   for the action from those that led to the conduct that eventually injured the
2   plaintiffs. *See id.* at 358. The Court found that the Saudi government's
3   recruitment and employment of Nelson were commercial activities but not the
4   bases for the plaintiffs' suit. *See id.* Instead, the Court defined the basis for the
5   suit as the Saudi government's abuse of its police power. *See id.* at 361.

6       Although this is a child abduction case and *Nelson* involved a wrongful
7   arrest and torture by a foreign government, defendants' alleged misconduct here
8   also boils down to an abuse of their police power. Plaintiff is essentially claiming
9   that defendants abused their sovereign power to regulate child welfare and custody
10  proceedings. This abuse of power is the basis or foundation of plaintiff's
11  allegations. Plaintiff alleges that defendants took multiple discreet actions in
12  support of their conspiracy, including hiring a U.S. law firm to seek the children's
13  return in U.S. courts. Such incidental activities, however, do not form the basis for
14  this action for purposes of analyzing the commercial activity exception because
15  they alone would not entitle plaintiff to any relief if proven at trial.

16          **b.      Defendants' Alleged Misconduct Does Not Constitute**
17                  **Commercial Activity**

18      The FSIA defines commercial activity as "either a regular course of
19  commercial conduct or a particular commercial transaction or act." 28 U.S.C.
20  § 1603(d). "The commercial character of an activity shall be determined by
21  reference to the nature of the course of conduct or particular transaction or act,
22  rather than by reference to its purpose." *Id.* Thus, "[e]ven if performed with a
23  public purpose in mind, acts by governmental entities are considered commercial
24  in nature if the role of the sovereign is one that could be played by a private actor."
25  *Park v. Shin*, 313 F.3d 1138, 1145 (9th Cir. 2002) (citing *Weltover*, 504 U.S. at
26  614-15).

27      The alleged misconduct in this case – defendants' abuse of their sovereign
28  power to regulate child welfare and custody proceedings – is like the kind of

14

activity that courts have found to be non-commercial.  *Compare Nelson*, 507 U.S. at 351 (injuries resulting from unlawful detention and torture by foreign government are not based on commercial activity); *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 167-68 (D.C. Cir. 1994) (kidnapping by a foreign government is not commercial activity); *De Letelier v. Republic of Chile*, 748 F.2d 790, 797 (2d Cir. 1984) (government-sponsored assassination is not commercial activity) *with Weltover*, 504 U.S. at 617, 620 (Argentina's issuance of government bonds was a commercial activity because it participated in the bond market in the manner of a private actor); *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 871 (9th Cir. 2000) (entering into an illegal contract to convert government funds for personal use constitutes commercial activity).  These outcomes are consistent with Congress's intended interpretation of the term "commercial."  *See* H.R. Rep. No. 94-1487, at 16 (1976) ("Activities such as a foreign government's sale of a service or product, its leasing of property, its borrowing of money, its employment or engagement of laborers, clerical staff or public relations or marketing agents or its investment in a security of an American corporation, would be among those included within the definition [of commercial activity].").  And at least one federal court has held that the commercial activity exception does not apply to child abduction cases.  *See Singh v. Commonwealth of Australia*, 521 F. Supp. 2d 91, 91-92 (D.D.C. 2007) (attempt to invoke commercial activity exception in FSIA action alleging a conspiracy to kidnap a child "merit[ed] little discussion").

For these reasons, plaintiff's reliance on the FSIA's commercial activity exception should be rejected.

### 2.     The FSIA's Tortious Activity Exception Is Inapplicable

The FSIA's tortious activity exception permits jurisdiction where: money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state

1    or of any official or employee of that foreign state while acting within

2        the scope of his office or employment . . . .

3    28 U.S.C. § 1605(a)(5).  "Although the actual words of the statute require only that

4    a claimant's *injury* occur in the United States . . . , the Supreme Court has stated

5    that this exception 'covers only torts occurring within the territorial jurisdiction of

6    the United States[.]'"  *Broidy*, 982 F.3d at 590 (quoting *Argentine Republic v.*

7    *Amerada Hess Shipping Corp.*, 488 U.S. 428, 441, 109 S. Ct. 683, 102 L. Ed. 2d

8    818 (1989)).  In addition, the exception does not apply to claims (1) "based upon

9    the exercise or performance or the failure to exercise or perform a discretionary

10   function regardless of whether the discretion be abused" or (2) "arising out of

11   malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or

12   interference with contract rights."  28 U.S.C. § 1605(a)(5)(A) to (B).

13       Here, most of the torts allegedly perpetrated by defendants took place in

14   Norway.  *See generally* FAC.  The tortious activity exception would not apply to

15   such acts.  However, plaintiff also alleges that defendants committed several torts

16   in the U.S. in connection with the prior Hague Convention litigation that resulted

17   in the minor plaintiffs' return to Norway.  *See, e.g., id.* ¶¶ 86-88, 92, 94-95, 102,

18   104, 109, 111, 113, 117.  Although the exception would apply to such misconduct,

19   there are several problems with that group of allegations.

20       a.    **Plaintiff's Claims Arising From Conduct in the U.S. Are**

21              **Frivolous**

22       A frivolous complaint "lacks an arguable basis either in law or in fact."

23   *Neitzke v. Williams*, 490 U.S. 319, 325, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989).

24   Federal courts cannot entertain claims, otherwise within their jurisdiction, that are

25   "so attenuated and unsubstantial as to be absolutely devoid of merit, . . . wholly

26   insubstantial, . . . obviously frivolous, . . . plainly unsubstantial, . . . or no longer

27   open to discussion."  *Hagans v. Lavine*, 415 U.S. 528, 536-37, 94 S. Ct. 1372, 39

28   L. Ed. 2d 577 (1974) (cleaned up).  Courts may sua sponte dismiss a factually

frivolous complaint at any time. *See, e.g.*, *Decormier v. Nationstar Servicers, LLC*, 2020 WL 5989180, at *1-2 (E.D. Cal. Oct. 9, 2020) (compiling cases).

Plaintiff's claims here that defendants were extensively involved in litigating the prior federal cases appear to be baseless. In those cases, his ex-wife, not defendants, sued plaintiff for wrongfully removing his children from Norway in violation of his ex-wife's rights of custody. *See Rosasen I*, docket no. 96 at 1. A review of the dockets in those proceedings shows that none of the defendants were parties or otherwise significantly involved in that litigation. *See, e.g.*, *id.*, docket no. 3 (notice of interested parties does not list defendants); *Rosasen II*, docket no. 14 (same). Indeed, the only direct accusation against the Norwegian government in those cases is buried in a declaration signed by the plaintiff. In passing, plaintiff claimed that the Norwegian government paid for his ex-wife's legal representation and was the one "who want[ed] the children to [sic] Norway and who after exerting pressure on my poor wife for months finally got her to claim/file a false Hague case." *Rosasen I*, docket no. 95 at 17-18; *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (the Rule 8 plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully" (citation omitted)).

In this case, plaintiff completely shifts the blame for the prior litigation to defendants. This new angle differs from plaintiff's position in the prior litigation, where plaintiff mostly accused his ex-wife, her mother, and her ex-wife's counsel of the same misconduct alleged in this case, including perjury, fraud on the court, kidnapping, harassment, and constitutional torts. *See Rosasen I*, docket no. 28 ("Answer") at 9-10, 12, 24-29. Plaintiff does not explain why his theory of the case has changed so dramatically, which raises suspicion that he may be trying to get a second bite at the apple. *See Decormier*, 2020 WL 5989180, at *1-2 (finding suit factually frivolous based on misrepresentations in instant case, and similar issues raised in a different case pending before the court). The court thus

17

recommends dismissal of the remaining claims as frivolous.

**b.** <u>**Plaintiff's Claims Arising From Conduct in the U.S. Are**</u>
<u>**Barred by Issue Preclusion**</u>

In the alternative, even if the court accepted plaintiff's allegations as plausible, issue preclusion would bar his claims relating to tortious activity in the U.S. "The related doctrines of claim and issue preclusion, by precluding parties from contesting matters that they have had a full and fair opportunity to litigate, protect against the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1020 (9th Cir. 2019) (cleaned up; quoting *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008)). Issue preclusion, also known as collateral estoppel, applies if: (1) the issue at stake is identical to the one alleged in the prior litigation; (2) the issue was actually litigated by the party against whom preclusion is asserted; and (3) the determination in the prior litigation was a critical and necessary part of the judgment in the earlier action. *See Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1042 (N.D. Cal. 2014) (citing *Gospel Missions of Am. v. City of L.A.*, 328 F.3d 548, 553-54 (9th Cir. 2003)).

As previously explained, the tortious activity exception could only apply in this case to the alleged torts perpetrated in connection with the prior federal cases in the U.S. To summarize, plaintiff claims the Hague Convention petition allegedly filed by defendants falsely accused him of international child abduction and misstated facts in an effort to violate his fundamental rights. *See* FAC ¶¶ 86-87. In fact, he alleges that opposing counsel, at defendants' direction, misled the court throughout the case to accomplish their goal of returning the children to Norway. *See id.* ¶¶ 109, 111, 113, 117. He also argues that the petition was procedurally flawed and intentionally bypassed several U.S. laws. *See id.* ¶¶ 88, 92, 94, 102, 104.

Plaintiff litigated each of these issues in the prior litigation.  In those cases, he also claimed that the Hague petition was based on false and unsubstantiated allegations and intended to violate his constitutional rights (*see Rosasen I*, Answer at 9); that it was forum-shopped, violated multiple rules and laws, and sought to bypass the U.S. legal system (*see id.* at 9, 32); and that opposing counsel repeatedly lied to the court (*see id.* at 9, 12, 24-25, 27, 29).  The court's rejection of plaintiff's contentions was critical and necessary to the judgment in favor of his ex-wife.  Had the court found merit in any of these issues, it would not have granted the petition and ordered the immediate return of the children to Norway.

In sum, plaintiff's claims are little more than a recitation of the same issues raised in the prior litigation.  As already explained, preclusion doctrines have multiple purposes, including minimizing possible inconsistent decisions.  That consideration is all the more important in this case given that plaintiff's appeal of the prior judgment granting his ex-wife's Hague petition is still pending.  *See Thea Rosasen v. Marlon Rosasen*, docket no. 20-55459 (9th Cir.).  Accordingly, the court should find that issue preclusion bars plaintiff's remaining tortious claims.

<strong>c.    <u>The Tortious Activity Exception Does Not Apply Because of the Malicious Prosecution and Abuse of Process Exclusions</u></strong>

Finally, the exclusion from the tortious activity exception of claims arising out of malicious prosecution and abuse of process bars plaintiff's tort claims based on the prior federal cases.  *See* 28 U.S.C. § 1605(a)(5)(B).

It is unclear whether Congress intended to define the terms "malicious prosecution" and "abuse of process" in the FSIA according to a federal standard or to the forum's state law.  *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1204 (9th Cir. 2003); *but cf. Cassirer v. Thyssen-Bornemisza Collection Found.*, __ U.S. __, 142 S. Ct. 1502, 1507-08, 212 L. Ed. 2d 451 (2022) (courts must apply the forum state's choice-of-law rule to determine what substantive law to apply when a party raises non-federal claims against a foreign

19

state).  Regardless, both California law and general legal principles conceptualize malicious prosecution and abuse of process as the wrongful use of legal process. *See Blaxland*, 323 F.3d at 1204.

Under California law, a litigant may bring a claim for malicious prosecution if a prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice.  *Zamos v. Stroud*, 32 Cal. 4th 958, 965, 12 Cal. Rptr. 3d 54, 87 P.3d 802 (2004) (citations omitted).  In the federal context, the tort of malicious prosecution is reserved for criminal proceedings lacking probable cause.  *See* Restatement (Second) of Torts § 653 (Am. L. Inst. 1977).  The civil alternative is the tort of wrongful civil proceedings, which applies to anyone "who takes an active part in the initiation, continuation or procurement of civil proceedings against another" (1) without probable cause and with a primary purpose other than to secure the proper adjudication of the claim, and (2) the action was resolved in favor of the person against whom it was brought. *See id.* § 674.

To establish a claim for abuse of process under California law, a party must show that the defendant "(1) contemplated an ulterior motive in using the process; and (2) committed a willful act in the use of the process not proper in the regular conduct of the proceedings."  *Brown v. Kennard*, 94 Cal. App. 4th 40, 44, 113 Cal. Rptr. 2d 891 (2001) (citations omitted).  "The essence of the tort is misuse of the power of the court; it is an act done in the name of the court and under its authority for the purpose of perpetrating an injustice."  *Id.* (cleaned up).  Similarly, the Restatement (Second) of Torts provides that "[o]ne who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process."  Restatement (Second) of Torts § 682.

Here, plaintiff does not explicitly bring claims for malicious prosecution or

20

abuse of process. In fact, he would not meet the standard for malicious prosecution because the prior litigation resolved in favor of his ex-wife. But the language of the exclusions covers any claims "arising out of" malicious prosecution or abuse of process, even if the litigant does not raise those specific claims. *See Khochinsky v. Republic of Poland*, 1 F.4th 1, 11 (D.C. Cir. 2021) (holding that First Amendment retaliation and tortious interference claims arose out of an alleged abuse of process). Plaintiff alleges that defendants brought the Hague cases without probable cause and with the intent to violate his fundamental rights. *See* FAC ¶¶ 86-87. Defendants then proceeded to abuse the judicial process by violating procedural and substantive rules and misrepresenting facts to the court. *See id.* ¶¶ 88, 92, 94, 102, 104, 109, 111, 113, 117. It is unclear which of the causes of actions listed in the FAC apply to these specific allegations. But regardless of how plaintiff pled his complaint, any legal claims covering these allegations would "arise out" of a malicious prosecution and abuse of process allegedly perpetrated by defendants. Accordingly, the exclusions found in § 1605(a)(5)(B) of the FSIA bar all claims that plaintiff intended to raise in connection with the prior litigation.

　　For these reasons, the court recommends finding that the FSIA's tortious activity exception is also inapplicable.[7] Accordingly, there is no basis for jurisdiction under the FSIA, and plaintiff's claims should be dismissed. *See, e.g.*,

---

[7]　　In its OSC regarding jurisdiction, the court noted that plaintiff's claims may also be barred by the discretionary function exclusion to the tortious activity exception. *See* OSC Re: Jurisdiction at 7-8. Plaintiff responded that defendants also violated multiple Norwegian laws as a result of their conspiracy to abduct his children. *See* P. Resp. to OSCs at 10. The discretionary function exclusion does not apply when a foreign state violates its own internal law. *See Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989). At this time, the court is not in a position to resolve plaintiff's argument that defendants violated Norwegian law. Accordingly, the court does not recommend the discretionary function exclusion as a basis for dismissal.

1  *Rizvi v. Dep't of Soc. Servs.*, 828 F. App'x 818, 819-20 (3d Cir. 2020) (no FSIA
2  jurisdiction where father alleged Switzerland colluded with U.S. agencies to
3  interfere with his parental rights by raising false allegations of child abuse).

4  **D.   Leave to Amend Would Be Futile**

5      The court generally must give a pro se litigant leave to amend his complaint
6  "unless it determines that the pleading could not possibly be cured by the
7  allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en
8  banc) (internal quotation marks omitted).  Thus, before a pro se civil rights
9  complaint may be dismissed, the court must provide the plaintiff with a statement
10  of the complaint's deficiencies.  *Karim-Panahi*, 839 F.2d at 623-24.  But where
11  amendment of a pro se litigant's complaint would be futile, denial of leave to
12  amend is appropriate.  *See James v. Giles*, 221 F.3d 1074, 1077 (9th Cir. 2000).

13      Here, the court sees no plausible way to amend the allegations to meet any
14  of the exceptions for jurisdiction under the FSIA.  The SAC plaintiff filed does
15  nothing to correct the identified defects, nor could it.  No amendment could
16  possibly make the basis for plaintiff's complaint a commercial activity.  And even
17  if plaintiff provided an explanation for why the allegations subject to the tortious
18  activity exception are not frivolous or precluded, they would still arise out of an
19  alleged malicious prosecution or abuse of process.  Thus, because leave to amend
20  would be futile, dismissal without leave to amend is warranted.

21  //
22  //
23
24
25
26
27
28

## V.

## __RECOMMENDATION__

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Report and Recommendation; (2) striking the Second Amended Complaint as improperly filed; and (3) directing that Judgment be entered dismissing the First Amended Complaint and this action with prejudice and without leave to amend.

DATED: July 14, 2022

_____
SHERI PYM
United States Magistrate Judge